May it please the court, counsel, and members of this auditorium. What I'd like to do at this point, since we have, oh, my name is Michael Wolverine, I represent Maricopa County and Maricopa County Correctional Health Services, in this case the appellants. What I'd like to do at this point is to reserve, to take any questions that the court may have, but to reserve the remainder of my time for rebuttal. Well, you've got two big issues, big hurdles. One, whether there's any jurisdiction, and two, whether there's any privilege. So perhaps you should give us some reasons for saying there's jurisdiction and some reasons for saying there's a privilege. Jurisdiction is as set forth in our reply brief, more specifically based upon the Cohen doctrine, that this is a collateral issue to the case, and it's an important issue because it covers the issue of privilege. And the court's decision in Cohen, the Supreme Court's decision in Cohen, laid the groundwork for collateral issues to be raised on an interlocutory basis. Where do we draw the line, counsel? It seems to me you have a point that if there is a privilege and it's asserted, and asserted privilege is denied by the district court, and the investigation, deposition, production, or whatever it is goes forth anyway, that it's become moot and you've lost your chance to appeal, and I accept that. But if we adopt your rule, then every time somebody asserts privilege, aren't they going to be up here on an interlocutory appeal? I think that's a distinct possibility, given the nature of the privilege, and I guess it depends upon how important that privilege is in certain contexts. So how do you draw the line? On a case-by-case basis, as it seems to be in the case law, Your Honor. Well, how is this case mooted? I mean, if the privilege, if we were to uphold the privilege, and the information that came to the plaintiffs was because of the incorrect waiver or denial of the privilege, why couldn't we simply at the end of the proceeding reverse for a new trial without the taint of the improperly admitted evidence? Well, there's two reasons. One is specifically the information at issue here. The mortality review has already been conveyed to the plaintiffs. They have it in their possession and will do whatever they choose with it at that point. But they can't introduce it into evidence. No, but they would have it in their domain. It would already have been given up by the county to them, and so as the court instructed in Cohen, once a secret's released, it's no longer a secret. And that would be the case here, too. Secondly, it seems to me that it's important for the privilege to be upheld on a at least Ninth Circuit basis for all institutions that engage in this type of activity. Well, that could be decided at the end of your case, then. Which could be quite a length of time, particularly when you consider an appeal may be in the offering at the end of the trial. We could be looking at years down the road. It's important for these institutions to have certainty with regard to what they conduct for activities of peer review currently. Well, they've been in the dark for 50 years or more. What's another couple of years? We have no cases on peer review privilege, right? There are. Self-critical privilege. You have some dicta that you probably don't like. Well, actually, there's some dicta from this court that's favorable in recognizing the privilege in the context of the shipping case, the dowling case, and discussing the criteria for the application of the privilege. And it's important for the institutions to know that that discussion then carries over, that dicta carries over for utilization in supporting their peer review activities. And from a state law standpoint, peer review has been almost sacrosanct. They have recognized, the state courts have recognized that it's almost in the nature of an absolute privilege. Well, they know it doesn't exist in the federal, in this circuit. So they function with peer review in the absence of any unanimous privilege. So why does it make any difference how quickly we come to a conclusion? They work faster than you think. They function at their peril at this point. And many of these instances, they rely upon state statutory privileges. I'm not sure that this issue has been thoroughly briefed, from what I can tell from case law in this circuit, to give them any guidance. But the institutions of this nature, which there are many, all of the jails across the nation, provide health care in some form or fashion, and specifically in this circuit. And at this juncture, with no reported opinion, they do function to some degree at their peril. And I think many believe, as did Maricopa County Correctional Health Services, that the state would have the state peer review privilege would apply. And, in fact, as I pointed out to the court, specifically in our policy, they adopted the state statutory language. You know, the odd twist of this case, I think, in the context of privilege is that it's a state institution. The original peer review privilege came in the context, and certainly some hospitals are supported by the state, but it came in the context of medical care that was provided by generally private facilities. Why should we protect the internal investigation of a government entity? It's exactly the same reason why you protect it in a private context. There's an overwhelming public policy interest, as noted from everyone from Congress down through almost every group. Didn't Congress grant the privilege? Congress did not grant the privilege as of yet. Well, isn't that the way you should be addressing your remarks? Let me clarify my remark. It says the increasing occurrence of medical malpractice and the need to improve the quality of medical care had become nationwide problems that warrant greater efforts than those that can be undertaken by any individual state. That was with the Health Care Quality Improvement Act of 1986. And they didn't provide a privilege. They did not, and they also did not overrule BRITIS, which specifically recognized the existence of such a privilege. There's an overwhelming public policy in support of such activities, and in particular when it comes to a mortality review. And I would like to make it clear that what we're asking for this Court to do is to recognize the existence of the self-critical analysis privilege only in the context of medical peer review and specifically with regard to the mortality. Now, how can you say an overwhelming public policy when Congress failed to recognize it? This was a federal issue. Congress was legislating to protect these peer reviews. It did not do it. So there's an absence of public policy. There is some articulated public policy in the statute that I refer to. Does it refer to this privilege? It does not refer specifically to the self-critical. Does it refer to the privilege? It does not refer specifically to the self-critical. Then why do you say specifically? It does not refer to it. Because there is some immunity provided in that statute. Oh, yes. They thought about immunity, and they declined to give the privilege. They gave immunity, but not privilege. And there's some confidentiality set forth for some of the documents. The fact that they didn't overrule Bredis or specifically say that they were going to overrule the rationale in Bredis, I think, gives us support for the fact that they didn't intend to take that away. That's overwhelming. No, the part that's overwhelming is that every state and virtually every decision, including the decision cited by the plaintiffs, says that there's an overwhelming public policy in support of this type of activity. We want to improve health care. And that's a ñ Will they stop doing it if they don't have the privilege? I believe Dr. Scalzo's affidavit that was attached to our reply brief as an excerpt specifically says that we'll chill that process. People have already come up and told him they're going to be less likely to want to participate in that process. Well, they have to, because to get accredited, hospitals have to do that for accreditation purposes. So it's going to continue. There's no doubt about that in the private sector. And will the doctors be less honest if they didn't have the privilege? I think that's exactly the outcome of this. You think they would be dishonest? No, I don't think they would be dishonest. I don't think they would be as full and frank in their discussion, which is the whole premise behind this. And in addition to that, another part of this premise that seems to be lost on a lot of the technicalities is the fact that we're trying to improve the care for the inmates that come through the facility. No, but in all of the legislative history that you've cited, I don't see, and I may have just missed it, I didn't see an overwhelming discussion of or concern about counties and protecting county inmates. What I see is that Congress is concerned about rising malpractice rates and they want to provide some tort immunity. Isn't it different with the public entity? Aren't the public policy concerns far different when we're dealing with how inmates are treated in a jail in terms of what the public has a right to know versus what happens in a hospital? I think it's exactly the same privileged issue. I don't think it's any different when it comes to the health care delivery that's provided to them. And we're not talking about the sheriff and the way that the sheriff deals with the people. We're talking about the health care that was provided. At issue in this case specifically was the health care provided primarily by Nurse Betty Lewis and also on the back end when he went into code arrest by another nurse that was involved. Over the course of 40 minutes, what was reviewed was the care and the conduct of the nurses involved in this case. That's what is at issue. And that's no different than it would be in any other hospital. Well, it is different in the sense that we have incarcerated people. People are free to leave hospitals. They have their own private remedies. But the public has an interest in safety and knowing what's going to happen to Ed Pelican Bay or the county jail. And aren't you actually chilling the right of the public to know whether health care is provided and to provide adequate funds perhaps for that? Aren't the public policy considerations different? No, I think the public policy considerations are exactly the same, as I said, that it's health care that's being delivered. And that health care can start from the minute that person is brought in before they are actually incarcerated. It doesn't really make any difference. In fact, in this case, Mr. Eggster was brought to our jail. No one had yet made a decision from the minute he walked in that door whether he was going to stay there or not. The nurse immediately provided some health care to him. It's exactly the same as if he was taken to an emergency room at a hospital. He was provided health care. An adverse event occurred in connection with that, and a mortality review was done in order to try to look for any type of a pattern or symptoms that might have been able to be picked up on earlier so that they could react better in the future. Well, let's take the case where an extreme hypothetical case where an inmate dies as a result of being beaten by police on the way to your jail. You investigate it, and you say, yes, we think these bruises are the way that he died. It's not consistent with the stories we've heard. We think the police officer did that. You would say that that's absolutely privileged, right? No. Why? No, because it's the police whose conduct is at issue. No, but this is a mortality. We're talking about the mortality discussions that happen. The mortality discussions are centered only, and if you look at the policy that's provided in the excerpts of record, it specifically says what the limit is as to the mortality review. It says that inmate deaths will be reviewed to determine if appropriate interventions were undertaken immediately surrounding the death, if there was a pattern of symptoms that might have resulted in earlier diagnosis and intervention, and if there are emerging patterns when compared with other inmate deaths. It's specific to medical care. And in the example that you gave, Your Honor, that's the police acting with regard to their care and custody of this individual, not the medical care that that individual received. It's absolutely no different in this context for correctional health services as it would be in the private sector. They're looking to ensure that there isn't something that they can do better, which is obviously a laudable goal in the future from a medical care standpoint for there not to be another result like this, to the extent they could have done anything differently. So you want us to, from this bench, write a peer-reviewed self-critical privilege that puts the limitations and detail in it that you just quoted to us? What I'm asking this Court to do is to, one, recognize, to pick up where you left off in Dowling, and to recognize the existence of the self-critical analysis privilege specifically with regard to peer review or mortality reviews in order to specifically apply it in this instance. And then we should extend it to railroads, as in the case of Maurer, because they are on the nation's highways and tracks, and they move freight, and they're critical to the employment, and then to accountants because the whole financial institution structure is critical to the United States, and to businesses that do peer reviews after they've been found to have violated or may have violated the securities laws. In other words, how do we write a peer review or a self-critical privilege that we limit to the medical profession without then getting down the slippery slope of every other industry or profession that thinks its activities are critical to the public interest? The way I think the Court does that specifically is to follow the lead in Bredis and to follow the lead in Wikati, which were both cited to the Court, and to dovetail that with the decision, as I said, in Dowling, and apply those factors specifically to the health care peer review and even more specifically to the mortality review. You don't have to extend it any further beyond that to any other situation. Well, no, we don't have to, but I think that the logic would dictate that we start doing that, don't you think? What's different from your argument saying people aren't going to be honest in this context from engineers won't be honest in a product liability case within their company in trying to figure out why a product failed? Well, what I think is specifically different is the overwhelming public policy that exists in favor of conducting medical peer reviews and, in particular, mortality reviews. And certainly someone else can come along later, obviously, and take that opinion and say, well, perhaps it applies to my situation. That's already been done before this Court in Dowling. That was a shipping case that kind of got the ball rolling in that direction of a self-critical analysis privilege. But, again, I think if the Court limits it specifically to peer review and to mortality reviews, then it's accomplished the goal of protecting this information, giving guidance to those governmental institutions that receive inmates of this nature that can end up with complaints of this nature, and then still protect the integrity of the peer review process. Certainly any other cases are for another day. It's not before the Court at this point, and, again, I think it's distinguished by the fact there is this overwhelming public policy interest. And as far as Maurer is concerned, I don't think Maurer really turned on the railroads' desire for protection from their reports that they prepared like it was in Granger that was cited to this Court, and this Court also picked up on in its analysis in Dowling, that Maurer turned a little bit more from the standpoint on the fact that there was no self-critical analysis privilege recognized in California or Arizona law, at least insofar as that situation was involved, which, as I recall, involved some type of litigation summaries that were prepared by a claims adjuster. Again, that was a diversity action. They were looking to state law. And, frankly, I have to, as I thought about this, I thought that the statement that there was no self-critical analysis privilege recognized in California might not have been entirely accurate, because California, like every other state in this nation, has a statutory peer review privilege, which, as we now know, devolves from the self-critical analysis privilege. We've taken up more than all of your time with our questions, so thank you. And we'll give you a couple minutes. Thank you. May it please the Court, my name is Sean Berberian with Stinson, Morris & Hecker, and I represent the Appellees, the Agster family in this matter. As the Court has already, I think, discussed, federal law clearly controls this case. This is a Section 1983 case, a wrongful death Section 1983 case at that. There is no federal peer review statute. That is a blanket peer review statute. That is clear as well. And Correctional Health Services is not trying to argue that there is. They're asking the Court to actually create a blanket peer review statute. But under Federal Rules of Evidence Rule 501, and the two Supreme Court cases analyzed in that statute, the Courts cannot create a statute where Congress has already declined to make that privilege. It would be stepping outside of its bounds under Rule 501. Therefore, the Court here, its hands are tied from creating a blanket peer review statute. Congress has already addressed it. Congress has created actually five. Where does it talk about the privilege? I'm sorry? Where does Congress talk about the privilege? Well, Congress talks about the privilege. In our briefing, we discussed the Health Care Quality Improvement Act. But since then, I've actually found four other statutes where Congress has actually enacted very narrow versions of what you would call a peer review statute or a self-critical analysis privilege. So we're supposed to infer from silence that our hands are tied, notwithstanding the authority of 501? Well, because, for example, the Health Care Quality Improvement Act, Congress was presented with the issue of trying to protect doctors. That was clearly an intent of the statute there, creating some kind of privilege. But they kept it extremely narrow. It only applies, the peer review privilege only applies there if the doctors are reporting to a national reporting agency. And even then, it's only particular information that's given to that reporting agency. So we could carve out a privilege that fell within those confines? Absolutely. Well, that would apply nationally. But that does not apply here. Certainly it doesn't. Congress has also applied the peer review privilege to the Veterans Administration. They've also applied the peer review privilege to the Post Guard through the Social Security Act as well. Sounds like an emerging public policy to me. Well, yes, except that because Congress has acted in very narrow fashion, recognizing the privilege in only very particular situations. I believe we must infer that they did not intend to apply it broadly. And in fact the case is really about statutory construction. It's about whether or not we ought to recognize under Federal common law. And I take your point with respect to why Congress has not chosen to enact the privilege. And we have to draw some significance from that. But I just don't think our hands are tied. What's your best case that says that? That would be University of Pennsylvania, the EEOC. I mean, in that case the court rejected a peer review immunity. That case is in the context of peer review for tenure decisions in a university. And the importance there is that the claim was a Title VII discrimination claim against a university by a professor. The professor was denied tenure. And the court's analysis, and this is the key, the court's analysis looking at Title VII, initially Title VII gave immunity to universities. But several years later Congress removed that immunity for universities. So the court concluded. No, but that case doesn't say we can't create privileges. No, absolutely not, Your Honor. I think your argument was that our hands were tied, if I'm recalling your words correctly. Congress has spoken. Our hands are tied. We can't act. And what they say is we don't create and apply an evidentiary privilege unless it promotes sufficiently important interest to outweigh the need for probative evidence. So it doesn't stand with that proposition. Yes, Your Honor, maybe the hands are tied. I think the analogy was maybe improper. But what the University of Pennsylvania case, the Supreme Court did state, is that courts should be especially reluctant to recognize a privilege in an area where it appears that Congress has not provided the privilege itself. This is a perfect example of that. Congress has acted in very particular situations, very narrowly enacting the peer review privilege. It's clear that in the Quality Assurance Improvement Act the court considered the competing interest and actually said there would be no immunity from civil rights claims. The court or, excuse me, the Congress is actually considering balancing a civil rights claim with the peer review privilege. And in this case, very narrowly accepted the peer review privilege. So why did Congress grant peer review privileges to the VA? What was the public policy involved in that? I actually don't know, Your Honor. Was it the same public policy that's being urged here? One has to expect that it is. Yes, I would assume. I would not dispute that there is some public policy behind a peer review privilege. Obviously, states have enacted it. However, under federal law, it's also clear that the Congress has not decided to enact it as a blanket privilege, and they have also recognized competing interests. In the Health Quality Improvement Act, the competing interest is civil rights claims, and that's this case. It is a civil rights claim for the wrongful death of an individual in a jail. And so if we get to the stage of balancing interests, I would argue that certainly a wrongful death case based on a civil rights violation outweighs the interest in peer review privilege. But I would also argue that we don't even get to that point because Congress has already acted. Why would that be any different from a malpractice action filed in a state context? That's a fair question, Your Honor. It's because a civil rights claim has a much higher standard than a negligence claim. Deliberate indifference and excessive force analyses are a steeper claim than a mere negligence claim. Sure, but if those torts, if they had equivalent state torts, they would be subject to a state privilege in the proper state as well, right? I imagine it could, but I'm not aware of a state trying to enact a similar kind of analysis as a Section 1983 analysis. Well, every state has, including California, has protections for civil rights, statutory. Yes, discrimination claims and the like. Yeah, I would agree with that. There's some language in the legislative history under the Health Care Quality Act. Let me read it to you and just see if it's familiar to you. Do you have any insights about it? It says, when they were amending the statute, that nothing in this subchapter shall be construed as changing the liabilities or immunities under law or as preempting or overriding any state law that affords to members of the review process greater immunities or protection than those found within the statute itself. Now, the argument made here is that in Arizona and pretty universally, states have existing laws that provide peer review protection and privilege. Is that the kind of immunity that Congress may have been referring to in adopting that legislation? Your Honor, I don't believe it is because there is no authority for the proposition that a state immunity applies to a federal claim. Well, what was Congress referring to when it talked about not changing the immunities or preempting or overriding any state law? What was it referring to? I must admit, Your Honor, I don't know what specifically they were referring to. I do know that the Congress was recognizing that there was no immunity from a civil rights claim, but as far as the state statutes that they're referring to, I don't know what they were referring to. Did you plead state claims here? I didn't bring that in a complaint. I'm sorry? Did you plead state claims? Yes, Your Honor. And in cases where state and federal claims are brought together, there is case law that says that it would be impractical to try to apply a federal privilege law to one claim and a state privilege law to the other. It just would not work in this case. I don't know how that could be applied. So if you filed this in state court without the federal cause of action but using the equivalent state cause of action, you could get the documents, right? If we asserted only state law claims, I believe we would be limited to the state privilege. You kept the federal forum and limited yourself, perhaps. Well, I didn't choose the federal forum. The defendants or the appellants chose the federal forum for me. That's quite right. You don't like it here? There's no other place I'd rather be. Now, that's a good answer. But just in summary, Your Honors, I believe that when you weigh the two interests, that the civil rights claim in a wrongful death case outweighs the peer review privilege, but I believe that we don't even get to that point because Congress has acted very specifically and basic statutory interpretation would require us to conclude that Congress didn't know and did not intend to act to create a blanket privilege. Well, how do you square your philosophy with the text of Rule 501? Because it says, Except as otherwise required by the Constitution of the United States, provided by act of Congress prescribed by the Supreme Court pursuant to statutory authority, a privilege of witness, person, government, state, or political subdivision should be governed by the principles of common law, as they may be interpreted by the courts of the United States in light of reason and experience. And that's parsing statutory interpretation. Well, my position is the same as the Supreme Court's in the University of Pennsylvania in that the courts can create that, create federal common law. However, in 501, at the very beginning of the statute, it states basically that that is restricted by acts of Congress. And that's why the Supreme Court stated that the courts must be especially reluctant when it's clear that Congress has addressed issues that are, issues of privilege that are before it, that it should not be very hesitant to recognize that privilege. Because if Congress has said, oh, I'm going to step back, I'm not going to, Congress has not enacted such a privilege. You haven't said a word on our jurisdiction. Do you want to just say what your position is on that? Well, we do certainly believe that this does not properly fit within the collateral order doctrine. I believe we are kind of on a slippery slope. Every time someone's going to claim a new privilege, they're going to say, well, under the collateral order doctrine, District Court, you ordered me to produce it, but I'm not going to. I'm going to appeal. What's wrong with that? Well, the problem is that every time someone is going to allege a new privilege, like here where there is no federal privilege, volume doesn't scare us, so that's our problem. The problem is, in my case, it certainly matters to a plaintiff because I need that evidence. I need to get evidence against Correctional Health Services regarding patterns and practices of failing to properly evaluate detainees when they are presented to the jail. I need evidence regarding the deliberate indifference of the nurse when she failed to assess, you know, my client's son who died in that jail. Well, that assumes the conclusion of what we were to rule on privilege, but the issue that you spent all your argument on, you've been well prepared to argue why we shouldn't adopt a privilege. Why shouldn't it be heard now and resolved as opposed to waiting until the end of the case? I believe it could be properly addressed if we went to trial and the court addressed it in the Ninth Circuit. How do you respond to the argument they made, which is it's moot at that point because all the information has now been, it may not be admissible anymore in court, but you've got the benefit of all of the information that's shaped your whole case and you're able to proceed even though you shouldn't have had it in the first place. Well, the fear of disclosure is, it's really already gone because litigation is already present. That's an underlying kind of policy behind peer review privilege is that, you know, once the information gets out and is leaked, people are going to act upon it. Well, we've already acted upon the other information we've gained, so it's not like the disclosure of peer review privilege led to the litigation itself. It was just additional evidence. I think it could be corrected. If it was actually a reversible error, it could be tried again, but I don't believe it would be a reversible error. Thank you, counsel. Thank you, Your Honor. Mr. Rebuttal. Just briefly, since I know I'm on extended time. Let me pick up on where Mr. Berberian left off, that they'd already obtained evidence in this case to support their position. As I argued in my brief, what they're essentially asking for is cumulative evidence. And one of the ways that this issue about whether or not there is anything in the peer review or mortality review that could be of benefit from a civil rights standpoint can be handled is through an in-camera inspection by the trial court. Judge Gilbert didn't do that, and I think if this court was to believe that there is, indeed, a legitimate basis behind having a self-critical analysis privilege in the peer review context for mortality reviews, that certainly Judge Gilbert could be instructed to review this material in-camera to ensure that there isn't something that's precluding the plaintiffs from proving their civil rights claim. And one distinction I'd like to note with regard to virtually all of the cases that the plaintiffs cited is that those cases involved situations where the information was part of the operative facts of what the plaintiffs needed to prove. In other words, there was racial discrimination, antitrust issues, issues of that nature. In this case, what Mr. Berberian articulated to the court is that this is deliberate indifference, which is looking at the conduct of the individual to determine whether or not it rises to that level of indifferent difference. And that's an after-the-fact, 20-20 hindsight call when it comes to looking at the mortality review. So that's completely different than the operative facts that were set forth in the cases that the plaintiffs cited. Rather, what we're doing is looking at an after-the-fact review, 20-20 hindsight in the mortality review, and we're not trying to impinge upon the ability of people to conduct those kinds of reviews. Is there a protective order in place? Was that part of the court's order? No, there was not. Was it requested? I don't recall, to be honest with you. We were so focused on the privilege issue that I'm not sure. I recall, I believe, it being mentioned at one point, but I don't recall in what context. And I think that a protective order certainly would be absolutely warranted should the judge decide that there was anything in the mortality review that would benefit the plaintiffs. Because, again, you know, this is information that should not be leaked out. It's secret information, if you will, and should not be leaked out to the public. It shouldn't go beyond the confines of the case, if indeed that is true. And if there is nothing that would help the plaintiffs, if it's nothing but cumulative evidence, 26B2. I think you're arguing a lot of hypotheticals that haven't even been presented to the district court. I'm not sure we're going to fashion a protective order here. No, and I'm certainly not asking the court to do that. What I'm asking is that if the court decides to remand this back with instructions to Judge Tilburg, that you ask him to then consider a protective order, an in-camera review, and a protective order if necessary. University of Pennsylvania is one of those cases that seems to be widely cited. From my reading of it, it has very little, if any, application to this case. We're talking about tenure for a professor at a university, and it was certainly not analogous to a situation where we're talking about You don't think those are crucial issues at a university, whether a professor gets tenure or not? No, I think those can be very important issues in certain regards, Your Honor. Tough context in which to make that argument. That's right. There may be a lot of people in the audience who agree with you. But there's certainly a difference when it comes to medical peer review, and that's the point I'm trying to make. And I think the University of Pennsylvania has just been oversighted from that standpoint. And obviously, University of Pennsylvania will be very important to someone who is seeking tenure in a university status. Lastly, this Court's hands are not tied. Rule 501 specifically gives this Court the ability to interpret privileges with their reason and experience. That's all we're asking this Court to implement by looking at the cases that support peer review privilege, all of the state's laws that support peer review privilege, and to simply apply reason and experience to come to the conclusion that there should be a self-critical analysis privilege in the peer review context for mortality reviews. Thank you. Thank you, counsel. Thank both of you for your arguments and your briefing. The case is here to be submitted.
judges: Noonan, Thomas, Fisher